**William Amzi HOLT, III, Appellee**

v.

**Judith T. NAVARRO, M.D., Larkspur Healthcare Network, Friends Hospital, Friends Professional Associates, Inc., Friends Psychiatric Health Services, Inc., Tri–County Volunteer First Aid Corp., Inc. and Safecare Ambulance Services, Inc., d/b/a Network Ambulance Services**

**Appeal of: Tri–County Volunteer First Aid Corp., Inc.**

Superior Court of Pennsylvania.

Argued May 22, 2007.
Filed Aug. 16, 2007.
Reargument Denied Oct. 19, 2007.

Jonathan B. Sprague, Philadelphia, for appellant.

Frank P. Murphy, Norristown, for Holt, appellee.

BEFORE: MUSMANNO, GANTMAN, and PANELLA, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Tri–County Volunteer First Aid Corp., Inc., appeals from the final judgment entered in the Philadelphia County Court of Common Pleas in favor of Appellee, William Amzi Holt, III, following the denial of Appellant's motion for post-trial relief. We reverse and remand.

¶ 2 The relevant facts and procedural history of this case are as follows. On August 24, 2001, Appellee was at work when he experienced the first of several schizophrenic episodes. Appellee allegedly heard voices threatening his life. Fearing the threats were true, Appellee ran to a wooded area outside his workplace and hid for several hours. Appellee's co-workers contacted Appellee's parents, who came to Appellee's workplace to pick up their son. Appellee's parents took him to Abington Memorial Hospital where Appellee was evaluated and recommended for transfer to Friends Hospital to receive a mental health assessment. Appellee remained voluntarily committed at Friends Hospital for approximately six days, was placed on medication, and allowed to return home.

¶ 3 On September 4, 2001, Appellee experienced another psychotic episode. Appellee's parents were concerned when Appellee asked for the key to his father's gun cabinet. Appellee expressed that he wanted to practice his shooting, because "the voices" told Appellee they were going to harm him. Appellee's parents returned their son to Friends Hospital. The physician at the hospital recommended hospitalization for further evaluation. Appellee was then committed for immediate treatment. Before the hospital staff placed Appellee in his room, Appellee tried to leave the hospital. Appellee's father, however, convinced his son to stay and receive treatment.

¶ 4 Later that night, Appellee's parents received a phone call that Appellee had escaped the hospital's supervision during a transfer by ambulance from Friends Hospital to Charter–Fairmount Institute, another psychiatric facility. The ambulance team had not restrained Appellee during

this transfer, and Appellee fled as soon as the ambulance crew opened the doors.

¶ 5 Appellee ran to a shopping center and into a nail salon several blocks away. Appellee "had his nails done" and then asked customers to call him a cab. Appellee did not receive help calling a cab but he took a phonebook from the salon and entered a supermarket where he looked for a phone to call a cab. Appellee then saw a car with its engine running, in the supermarket parking lot, with two people standing near the vehicle. Appellee struck the owner of the vehicle across the face with the phonebook and climbed into the front seat of the car. The owner of the vehicle happened to be an off-duty police officer. He sat on Appellee's lap in an attempt to regain control of the car. Appellee was able to drive the car about sixty to seventy feet, but he ceased his struggle and relinquished control of the car when uniformed police officers arrived on the scene.

¶ 6 Police officers arrested Appellee at the scene and charged him with robbery, carjacking, and numerous other related offenses. Following a non-jury trial on August 6, 2002, the court rejected Appellee's insanity defense and convicted him of robbery and simple assault. The court sentenced Appellee to seven years' probation. Appellee did not appeal his criminal conviction.

¶ 7 On August 29, 2003, Appellee filed a complaint alleging negligence against Appellants and other defendants. Specifically Appellee alleged Appellant was negligent in transporting him between hospitals and, due to the criminal convictions resulting from his escape and subsequent offenses, Appellee suffered a reduced earning potential. Prior to trial, Appellee settled with other defendants and, over Appellant's objections, the trial court dismissed those defendants from the case.

¶ 8 On January 13, 2006, the jury returned a verdict for Appellee in the amount of $350,000.00. On May 8, 2006, the court awarded Appellee delay damages and molded the verdict in favor of Appellee to $377,730.95.

¶ 9 On January 18, 2006, Appellant filed a motion for post-trial relief seeking judgment notwithstanding the verdict ("JNOV") or, alternatively, a new trial or *remittitur.* The court denied Appellant's requested relief on May 11, 2006. On June 6, 2006, Appellant filed a *praecipe* for entry of judgment on the verdict. The next day, Appellant filed its notice of appeal. On June 15, 2006, the court ordered Appellant to file a concise statement of matters complained of on appeal pursuant Pa.R.A.P.1925(b). Appellant timely filed its Rule 1925(b) statement on June 21, 2006.

¶ 10 On appeal, Appellant presents the following issues for our review:

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] MOTIONS FOR DIRECTED VERDICT AND/OR JNOV BASED UPON PENNSYLVANIA PUBLIC POLICY AGAINST REWARDING CONVICTED FELONS FOR THEIR CRIMES, COLLATERAL ESTOPPEL DOCTRINE AND THE LACK OF PROXIMATE CAUSE?

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] MOTION FOR A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE?

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] MOTION FOR A NEW TRIAL BASED ON THE TRIAL COURT'S DISMISSAL OF [APPELLANT'S] CO-DEFEN-

DANTS FROM THE CASE AND THE RESULTING FAILURE TO INCLUDE [APPELLANT'S] SETTLING CO–DEFENDANTS ON THE JURY VERDICT SHEET?

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] REQUEST FOR A DIRECTED VERDICT AND/OR JNOV BASED ON [APPELLEE'S] CONTRIBUTORY NEGLIGENCE?

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] MOTION FOR A NEW TRIAL BASED UPON THE TRIAL COURT'S REFUSAL TO CHARGE THE JURY ON [APPELLEE'S] CONTRIBUTORY NEGLIGENCE AND/OR INCLUDE CONTRIBUTORY NEGLIGENCE LANGUAGE ON THE JURY VERDICT SHEET?

DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] MOTION FOR *REMITTITUR* BECAUSE THE VERDICT WAS SHOCKING TO ONE'S SENSE OF JUSTICE AND SUGGESTS THE JURY WAS INFLUENCED BY PARTIALITY, PREJUDICE OR MISTAKE?

(Appellant's Brief at 6).

¶ 11 Our standard of review of a trial court's denial of a motion for JNOV is as follows:

> [Whether], when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. Absent an abuse of discretion, the trial court's determination will not be disturbed.

*Ferrer v. Trustees of University of Pennsylvania,* 573 Pa. 310, 317, 825 A.2d 591, 595 (2002) (citations omitted). Furthermore:

> There are two bases upon which a [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Schindler v. Sofamor, Inc.,* 774 A.2d 765, 771 (Pa.Super.2001), *appeal denied,* 567 Pa. 727, 786 A.2d 989 (2001) (citations omitted). "When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case." *Advanced Telephone Systems, Inc. v. Com–Net Professional Mobile Radio, LLC,* 846 A.2d 1264, 1279 (Pa.Super.2004), *appeal denied,* 580 Pa. 687, 859 A.2d 767 (2004) (quoting *Van Zandt v. Holy Redeemer Hosp.,* 806 A.2d 879, 885–86 (Pa.Super.2002), *appeal denied,* 573 Pa. 686, 823 A.2d 145 (2003)).

¶ 12 For purposes of our disposition we need only address Appellant's first issue, in which Appellant initially asserts Appellee is barred, as a matter of law and public policy, from benefiting from his own criminal acts. Appellant relies on *Hurtt v. Stirone*, 416 Pa. 493, 206 A.2d 624 (1965), *cert. denied*, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965) and *Mineo v. Eureka Sec. Fire & Marine Ins. Co.*, 182 Pa.Super. 75, 125 A.2d 612 (1956) to support its proposition that the "no felony conviction recovery" rule applies to discourage courts from assisting convicted felons in collecting damages that would not have occurred absent the criminal conviction. Appellant avers Appellee's criminal convictions, and subsequent favorable civil verdict for damages flowing directly from Appellee's convictions, create an inconsistency disrespectful to the legal system. Appellant insists Appellee's criminal convictions collaterally estop him from obtaining damages flowing from those convictions. Appellant maintains the civil judgment of $377,730.95 for Appellee is in derogation of the legal prohibition against convicted felons benefiting from their own criminal acts. On this basis, Appellant concludes it was and is entitled to JNOV as a matter of law.

¶ 13 Appellant further argues Appellee failed to establish proximate cause. Appellant asserts Appellee's reduced earning potential was a remote and unforeseeable consequence of Appellant's failure to restrain him during transport. Appellant claims Appellee's "injury" was not the "natural and probable" result of Appellant's actions or omissions. Rather, Appellee's criminal conduct was the proximate cause of Appellee's reduced earning potential. On this ground, Appellant concludes it was and is entitled to JNOV, where the evidence was such that a verdict for Appellant was beyond uncertainty or doubt. We agree with both of Appellant's contentions.

¶ 14 The common law principle that a person should not be permitted to benefit by his own wrongdoing, particularly his own crimes, prevents a plaintiff from recovering losses which flowed from those criminal acts. *Mineo, supra*, at 615. In *Mineo*, two restaurant owners were criminally convicted of setting fire to their establishment. Shortly before the fire, the owners had purchased four insurance policies covering their restaurant. After their arrest, the owners assigned their title and interest in the insurance policies to the plaintiff. The plaintiff brought suit against the insurance companies to recover from the damages caused by the owners' arson. Following trial, the jury returned a verdict in the plaintiff's favor. The defendants sought JNOV, which was denied. On appeal, this Court was asked to determine whether an assignee of an insured can recover for damages caused by a fire the insured was criminally convicted of setting. According to the *Mineo* Court: "The assignee in an assignment of a fire insurance policy made subsequent to a fire stands in the identical position of the insured and his rights cannot rise above the insured." *Id.* at 614. This Court reversed the trial court and granted JNOV in favor of the defendants, holding: "We are of the opinion that when one is convicted of a felony and subsequently attempts to benefit from the commission, the record of his guilt should be a bar to his recovery." *Id.* at 618. *See also Hurtt, supra* (discussing how prior conviction can be relevant in civil case and bar civil recovery, where conviction is not of relatively minor matter).

¶ 15 Moreover, to sustain a claim for negligence a plaintiff must establish that the defendant owed a duty of care to the plaintiff, the defendant breached

that duty, the breach actually and proximately caused injury to the plaintiff, and the plaintiff suffered loss or damage as a result. *Brown v. Philadelphia College of Osteopathic Medicine,* 760 A.2d 863, 868 (Pa.Super.2000), *appeal denied,* 566 Pa. 632, 781 A.2d 137 (2001). Proximate cause does not exist where the defendant's negligence was so remote that the defendant cannot be held legally responsible as a matter of law for the harm done. *Id.* at 869. Significantly, proximate cause is a legal question; it involves a determination of whether the alleged negligence was so remote that as a matter of law, the defendant cannot be held legally responsible for the subsequent harm. *Reilly v. Tiergarten Inc.,* 430 Pa.Super. 10, 633 A.2d 208, 210 (1993), *appeal denied,* 538 Pa. 673, 649 A.2d 675 (1994). "Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of." *Id.* (citing *Merritt v. City of Chester,* 344 Pa.Super. 505, 496 A.2d 1220 (1985)). The court must evaluate the alleged facts and refuse to find an actor's conduct was the legal cause of harm "when it appears to the court highly extraordinary that the actor's conduct should have brought about the harm." *Brown, supra* at 868 (quoting *Bell v. Irace,* 422 Pa.Super. 298, 619 A.2d 365 (1993) (emphasis in original)). Thus, proximate cause "must be established before the question of actual cause may be put to the jury." *Reilly, supra.*

¶ 16 The Restatement (Second) of Torts provides guidelines to determine whether a defendant's conduct was the proximate cause of a plaintiff's injury: "(a) the number of other factors which contribute in producing the harm and the extent of the [a]ffect which they have in producing it; (b) whether the actor's conduct created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time." *Brown, supra* at 869 (citing Restatement (Second) of Torts § 433 (1965)).

¶ 17 In *Brown,* the defendant hospital had erroneously diagnosed the plaintiff's child with syphilis at birth. Following the diagnosis, the plaintiffs' marriage began to deteriorate when husband confessed he was involved in an extramarital affair with a co-worker that began during wife's pregnancy. After fighting one night, wife discharged her service revolver in the direction of husband. The event resulted in the arrest of both plaintiffs but neither was charged. Wife was subsequently fired from the Philadelphia police force for conduct unbecoming an officer. The plaintiffs sued the defendant hospital claiming the erroneous diagnosis was the proximate cause of the breakdown of the marriage, husband's physical violence toward wife, and wife's loss of employment as police officer after she shot at her husband, and husband's loss of consortium due to wife's "severe physical and psychological damage." Following a jury trial, the jury awarded the plaintiffs a total of $666,983.90, including delay damages. The trial court denied the defendant hospital's motion for JNOV.

¶ 18 On appeal, this Court applied the Restatement principles and determined husband's affair, his confession of the affair, and his suspicions that wife was having an affair had a far greater affect in producing plaintiffs' harm than the erroneous diagnosis. The Court concluded the erroneous diagnosis was not a substantial factor in bringing about the alleged damages. Further, the Court said the erroneous diagnosis "did not create 'a force or series of forces which [were] in continuous and active operation up to the time of the

harm.' Instead, [husband] confessed his adultery shortly after [wife] received the erroneous test results, before any retesting or verification of the results could be accomplished." *Id.* at 869–70. Finally, the Court stated:

> The primary physical altercation between the couple that resulted in [wife's] physical injury, the arrest of both parties, the filing of a protection from abuse order against [husband] and the couples' separation, occurred more than two months after the receipt of the erroneous diagnosis and in the month after they learned that the diagnosis had been in error. Thus, the lapse of more than two months, between the erroneous diagnosis and the initial break up of their marriage, point to a finding that [the defendant hospital's] negligence was not a substantial factor in bringing about this harm.

*Id.* The Court held "under all three factors set forth in the Restatement analysis, [the defendant hospital's] negligence was not a substantial factor in bringing about the breakdown of the [plaintiffs'] marriage and, thus, was not a proximate cause of this harm." *Id.* at 870. Finally, the Court held:

> Even more clearly, the erroneous test results were not the proximate cause of [wife's] alleged loss of income and earning capacity during the more than six years between the erroneous test and the trial. Instead, her independent act of discharging her service revolver in the direction of her husband on a public street (the month after she learned that the syphilis test results were erroneous) and the subsequent determination of the Philadelphia Police Department that such an action constituted conduct unbecoming an officer were the proximate causes of the termination of her employment as a police officer. This, combined

with her difficulties in finding adequate child care that would permit her to pursue full-time employment, are the proximate causes of her alleged reduction in income and earning capacity.

*Id.* at 870. Accordingly, this Court reversed the court's order denying JNOV, vacated the judgment, and remanded for entry of JNOV in favor of the defendant hospital.

¶ 19 Similarly, in *Matos v. Rivera*, 436 Pa.Super. 509, 648 A.2d 337 (1994), *appeal denied*, 540 Pa. 632, 658 A.2d 795 (1995), the plaintiff was one of three men who stole a pizza delivery truck. The plaintiff was subsequently injured as a passenger when the stolen vehicle crashed into a utility pole. The plaintiff sued the pizza delivery driver and his employer. Principally, the plaintiff alleged the serious injures he sustained as a result of the collision were due to the negligence of the delivery driver when he left the delivery vehicle unattended with the engine running while making a delivery. The trial court granted the defendants' motion for judgment on the pleadings for failure to state a cause of action and dismissed the plaintiff's complaint.

¶ 20 On appeal, this Court affirmed, because the plaintiff's complaint lacked any averments "that the delivery driver knew or should have known ... the delivery car might be stolen by an incompetent driver or that the stolen car would be driven in a reckless matter." *Id.* at 340. Further, this Court held the one thief's careless operation of the stolen vehicle was a superseding cause of the plaintiff's injuries, for which the defendants could not be liable as a matter of law. *Id. See also Reilly, supra* (holding establishment serving liquor to minor breached duty under Dram Shop Act; however, minor's subsequent assaults on his father and police, as well as subsequent wounds suffered from police

shots fired, were not natural and probable results of defendant's failure to comply with Act).

¶ 21 In the instant case, Appellant transported Appellee from Friends Hospital to the Charter–Fairmount Institute. When Appellee's ambulance crew opened the doors to the ambulance truck, Appellee jumped from the vehicle and fled. He ran to the nearest shopping center and into a nail salon. Appellee sat down at the salon, started to get his nails done, and asked if someone would call him a cab. When customers did not help him, Appellee took a phonebook from the nail salon and ran to a supermarket in search of a phone. In the supermarket parking lot, Appellee saw a car with the engine running. The owner of the car, an off-duty police officer, was standing outside of the vehicle. Appellee struck the officer with the phonebook, jumped into the car, and put it in gear. When the officer tried to regain control of his car, Appellee punched and kicked him, threatening to kill the officer. Only when uniformed police officers arrived at the scene did Appellee cease his struggle.

¶ 22 Following his carjacking attempt, Appellee was charged with the criminal offenses of simple assault, aggravated assault, robbery of a motor vehicle, theft, reckless endangerment of another person, unauthorized use of an automobile, resisting arrest, and terroristic threats. In a non-jury trial, the court rejected Appellee's insanity defense and determined Appellee knew the difference between right and wrong at the time of his offenses and made a rational decision to engage in criminal activity. The court, however, considered the circumstances of Appellee's mental health and his need for treatment. The court convicted Appellee of robbery, as a

second-degree felony and simple assault, as a second-degree misdemeanor.[1]

¶ 23 Subsequently, Appellee sued Appellant to recover for loss of potential earnings, claiming he was no longer able to pursue or sustain desired employment opportunities due to his criminal convictions. Appellee alleged Appellant was negligent in transporting Appellee and, but for Appellant's negligence, Appellee would not have committed criminal acts and suffered a diminished earning capacity as a result of his criminal convictions.

¶ 24 Under the "no felony conviction recovery" rule, the law precludes Appellee from benefiting in a civil suit flowing from his criminal convictions. *See Mineo, supra.* Appellee's convictions for robbery, a second degree felony, and simple assault, a second degree misdemeanor, are serious criminal offenses. *See Hurtt, supra.* We hold that, as a matter of law, Appellant cannot be liable for the collateral consequences of Appellee's criminal convictions. Therefore, the court erred in denying Appellant's post-trial motion for JNOV. *See Schindler, supra.*

¶ 25 Moreover, we observe the trial court did not make any threshold legal determination as to proximate cause before sending the case to the jury. *See Reilly, supra* (holding court's failure to make legal determination of proximate cause before sending case to jury constitutes error of law). Instead, the court simply denied Appellant's motions for nonsuit and directed verdict, and instructed the jury on factual causation.

¶ 26 Appellee bore the burden of proving each element of his negligence claim. *See Brown, supra.* Even if Appellant had breached a duty of care owed to Appellee,

---

**1.** Both offenses are specific intent crimes. *See generally* 18 Pa.C.S.A. §§ 2701(a)(1) and 3701(a)(1)(iv).

Appellee still had to establish Appellant's breach actually and proximately caused Appellee's injuries. Appellee failed to show proximate or legal cause to support his negligence claim. *See id.* Whereas Appellee's escape from the ambulance truck might have been a natural and foreseeable consequence of Appellant's failure to restrain Appellee during transport, we cannot agree that Appellee's loss of income due to his criminal behavior following the escape was a natural and probable outcome of Appellant's breach. *See Reilly, supra.*

¶ 27 Applying the Restatement principles to the present case, the record makes clear there were superseding factors, other than Appellant's failure to restrain Appellee during transport, which had a greater affect in producing Appellee's alleged harm. Appellee's assault on the police officer, his attempted carjacking, and his subsequent criminal convictions had a far greater affect on Appellee's reduced earning potential than the failure to restrain. *See* Restatement (Second) of Torts § 433(a). Appellant's failure to restrain Appellee did not create a force or series of forces which were in continuous and active operation up to the time of the lost income potential. At Appellee's criminal trial, the court determined Appellee's offenses resulted from Appellee's rational decision to commit criminal conduct. Once he fled from the ambulance, Appellee's independent decision to commit assault and robbery became the force in continuous and active operation leading up to his criminal convictions and subsequent loss of earning potential. *See* Restatement (Second) of Torts § 433(b). Finally, Appellee did not engage in criminal acts immediately upon his escape. Rather, Appellee ran to a nail salon, "had his nails done," and went to a supermarket in search of a phone. Thus, the affect of Appellant's acts or omissions on Appellant's conduct was too remote or attenuated "as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed" to the circumstances of Appellee's criminal actions. *See* Restatement (Second) of Torts § 433(c). Thus, we conclude Appellee's own criminal conduct was the substantial factor in causing his reduced earning potential. *Id.* Just as the plaintiffs in *Brown* and *Matos,* Appellee sought recovery for a harm that would not have occurred absent his own actions. Similarly, Appellee's own criminal conduct superseded Appellant's failure to restrain him as the proximate cause of his reduced earning potential. *See Brown, supra; Matos, supra.* Therefore, we hold Appellant was entitled to JNOV on this ground as well, because the evidence was such that a verdict for Appellant was beyond uncertainty or doubt. *See Schindler, supra.* Accordingly, we reverse the court's order denying Appellant's motion for JNOV, vacate the judgment, and remand for entry of JNOV in favor of Appellant.

¶ 28 Judgment reversed; case remanded for entry of JNOV in favor of Appellant. Jurisdiction is relinquished.